**Opinion issued September 8, 2015**



In The

# Court of Appeals

For The

## First District of Texas

———————————

### NO. 01-15-00253-CV

———————————

### IN THE INTEREST OF K.M.-J. AND D.A.R.-J

———————————————————————————————————

On Appeal from the 314th District Court
Harris County, Texas
Trial Court Case No. 2012-06289J

———————————————————————————————————

### MEMORANDUM OPINION

After a bench trial, the trial court terminated the parental rights of appellant, H.J., to her minor children, K.M.-J. and D.A.R.-J., and named the Texas Department of Family and Protective Services ("DFPS") sole managing conservator. *See* TEX. FAM. CODE ANN. § 161.001 (West 2014). In three issues on appeal, H.J. contends (1) the trial court abused its discretion by admitting medical

records that contained reports of medical professionals who were never designated as experts by DFPS; and (2) that the evidence was legally and factually sufficient to support the termination of her parental rights. We affirm.

## BACKGROUND

H.J. lived with her boyfriend, Jorge, in an apartment with her three-year-old son, Joseph,[1] her two-year-old daughter, K.M.-J., and her 10-month-old son, D.A.R.-J. Jorge testified that he was the father of the two youngest children, but he was not Joseph's father. H.J. testified that Joseph's father was Jose Martinez, and that he was deported when she filed a domestic abuse claim against him.

### The Death of Joseph and H.J.'s Inconsistent Statements

On November 4, 2012, H.J. called an ambulance to pick up her son, Joseph, at 4 a.m. Joseph died en route to Texas Children's Hospital. H.J. told the forensic nurse that Joseph had fallen the previous day at the park. The nurse noted bruising that could be consistent with a fall, but also noticed injuries not consistent with a fall, such as bruising behind his ears, looped bruises on his legs, and bruises on his back.

An autopsy performed the next day showed that Joseph died as a result of blunt-force trauma to the torso, which left several contusions on the right side of his chest and upper abdomen, and caused a ruptured intestine resulting in bacterial

---

[1]     For purposes of this opinion, we refer to all minors either by initials or a ficticious name. *See* TEX. R. APP. P. 9.8.

sepsis and peritonitis. Other injuries included abrasions to the forehead and face, contusions of the right cheek, left shoulder, and right thigh, and a superficial laceration of the lip.

Because of Joseph's death, DFPS received a referral and sent an investigator to speak with H.J. H.J. told the investigator that on the day before Joseph's death, she and the children got up, had breakfast, and went to the park. She stated that K.M.-J. was chasing Joseph, and he tripped over his untied shoelace. H.J. said she washed the scratch on his forehead and the children resumed playing for a few more hours before they went home. H.J. fed the children and then put them to bed at 9 p.m.—Joseph did not eat much, but he appeared fine. At around 4:00 a.m., H.J. got up to use the bathroom and heard Joseph moaning and pointing to his side. She called 911, and after some delay, EMS arrived to take Joseph to the hospital.

Jorge told police much of the same story, but admitted to "playfully hitting" Joseph in the stomach. He denied hitting Joseph hard enough to hurt him. H.J. admitted to seeing Jorge hit Joseph in a playful manner on the Friday before Joseph died on Sunday.

Police prepared a probable cause affidavit for Jorge's arrest, alleging that Jorge admitted to "play boxing" with Joseph. H.J. told police that on Friday, November 2, 2012, she heard Joseph cry, and when she went to check on him,

3

Jorge said that he was "play boxing" with Joseph and hit him in the stomach. Jorge was ultimately charged with Joseph's murder.

At a preliminary hearing in this case, H.J. testified about the "play boxing" as follows:

> They were playing as if they were fighting, boxing like. And they were playing fine. I didn't stop them or call the attention because the play was, you know, fine. And then I went to the kitchen to prepare food. And then I—when I heard him cry is when I came out and ask him what happened and why was he crying. He said that he was sorry he didn't mean to hit him or hurt him. And I picked him up to—sat him down to eat.

When asked again whether she saw Jorge hit Joseph, H.J. stated, "Frankly, I didn't see that. I was in the kitchen." When asked about the bruises on Joseph's legs, H.J. said that her friend's older children had hit him with sticks. She had earlier told DFPS investigators that one of the bruises had been on Joseph his whole life, that the bruises behind his ears were likely caused by K.M.-J. fighting with him, and that the bruises on his legs were from playing on ride-on toys, and were not caused by a belt or cord.

At trial, H.J. denied ever seeing Jorge "play boxing" with Joseph, and testified that she "said that because I felt pressured because I felt completely pressured to see my son laying there and I had to say something—to the—to see your son laying down there, laying down there dead." The following exchange then took place at trial during H.J.'s testimony:

4

Q: Now, one important point here is that you made a very big inconsistent statement. And the testimony here is that you did it on two occasions; one to the police officer and one to the [DFPS] investigator?

A: Yes.

Q: And today, you are telling this Court that the father never was play boxing with this child?

A: Yes.

Q: Explain why you felt pressure to making an inconsistent statement?

A: Because at that very day when I was seeing my child dead, I didn't know what to say because the man told me that if I didn't say anything I was going to be put in jail.

Q: Who was the man that said that to you?

A: The one that brought the detective over.

Q: Do you know his name? Do you know who he was?

A: No.

Q. Was he a police officer?

A: They were detectives.

Q: Are you telling this Court that you felt the pressure to say something that may explain what happened to this child?

A: Yes, because he was telling me, if you don't help me, you can go to jail.

The trial court then asked H.J. if, the last time she had testified before the court, she had made up the story about the play boxing with her boyfriend, and H.J.

5

responded, "Yes." When the trial court questioned H.J. about making up the story, the following exchange took place:

> [Trial Court]: You could have used any other person that's ever had contact with your son, but you used your boyfriend. I want to know why you used your boyfriend?
>
> [H.J.]: It was the only thing that occurred to me. The only thing that came to my mind.

***Evidence of Abuse or Neglect of K.M.-J.***

Because of Joseph's death, both of the other children were examined at Texas Children's Hospital on November 5th, and K.M.-J's medical records were entered into evidence at trial. K.M.-J. had swelling of the right ankle and x-rays showed a healing fracture. When asked about K.M.-J.'s broken ankle, H.J. said that the child took a bath on Saturday before Joseph's death, and that she injured her ankle stepping out of the tub. When asked why she had not told DFPS about the injury when she was first questioned, H.J. claimed that "she was nervous and forgot." K.M.-J.'s aunt told doctors that the injury was over a month old and that the child was standing on the toilet seat and injured it when she fell into the toilet. The aunt thought K.M.-J. had reinjured the ankle, but she did not know any details. The medical records state that "[t]he patient has clear injury apparent to anyone and medical treatment not obtained. This is consistent with abuse and neglect." The doctor also noted "multiple injuries without explanation," and "injuries of

6

different ages." The doctor also stated that "[t]here is also extensive callus formation involving [the] right tibia and fibula [that] indicated repeated trauma."

## ADMISSION OF MEDICAL RECORDS

In her first issue on appeal, H.J. contends the trial court erred by admitting Exhibit 17—K.M.-J's medical records from Texas Children's Hospital—"which contained opinions of experts that were never disclosed in response to a timely served request under TRCP 194.2(f)."[2] Specifically, H.J. argues that the medical records contained opinions by Doctors Penelope Louis and Victor Seghers, and that those doctors were never identified as testifying experts pursuant to Texas Rule of Civil Procedure 194.2(f), which provides:

A party may request disclosure of any or all of the following:

. . . .

(f) for any testifying expert:

   (1) The expert's name, address, and telephone number;

   (2) the subject matter on which the expert will testify;

   (3) The general substance of the expert's mental impressions and opinion and a brief summary of the basis for them, or if the expert is not retained by,

---

[2] When DFPS offered the medical records into evidence, H.J.'s counsel objected as follows:

> I object to Exhibit 17 on the basis that this document has just recently been provided to me and it contains opinions from doctors that were not identified in response to my disclosure request.

7

employed by, or otherwise subject to the control of the responding party, documents reflecting such information[.]

TEX. R. CIV. P. 194.2(f). DFPS responded only that the records were nonetheless admissible as business records, and the trial court admitted the records, including the records of Doctors Louis and Seghers.

If a party discovers its responses to written discovery are incomplete, it must amend or supplement its responses "to the extent that the written discovery sought the identification of persons with knowledge of relevant facts, trial witnesses, or expert witnesses." *See* TEX. R. CIV. P. 193.5(a). A party that fails to supplement a response in a timely manner may not introduce in evidence the material or information that was not timely disclosed or offer the testimony of a witness who was not timely identified, unless the trial court finds that (1) there was good cause for the failure to timely supplement; or (2) the failure to timely supplement the discovery response will not unfairly surprise or unfairly prejudice the other party. TEX. R. CIV. P. 193.6(a)(1)(2). The burden of establishing good cause or lack of unfair surprise or prejudice is on the party seeking to introduce the evidence or call the witness. TEX. R. CIV. P. 193.6(b).

The trial court may grant a continuance to cure unfair surprise or prejudice caused by a failure to comply with this rule. *See* TEX. R. CIV. P. 193.6(c). Even if a party fails to establish "good cause" a trial court has the power to consider other

options, including granting a continuance. *See id.*; s*ee also PR Investment & Specialty Retailers, Inc. v. State*, 251 S.W.3d 472, 480 (Tex. 2008) ("Even where a party fails to establish good cause for its failure to timely amend discovery responses, the court may grant a continuance to allow for supplementation of discovery responses or further discovery in response to the supplementation.").

### *Standard of Review*

We review a trial court's ruling on discovery matters for an abuse of discretion. *Bodnow Corp. v. City of Hondo*, 721 S.W.2d 839, 840 (Tex. 1986); *Adams v. Allstate County Mut. Ins. Co.*, 199 S.W.3d 509, 513 (Tex. App.— Houston [1st Dist.] 2006, pet. denied). Likewise, we review the admission of evidence under an abuse of discretion standard. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005). A trial court abuses its discretion when it acts unreasonably or arbitrarily, without reference to any guiding principles. *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991).

Erroneous admission or exclusion of evidence requires reversal if the error probably caused the rendition of an improper judgment. *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009); *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004). The Texas Supreme Court has recognized the impossibility of prescribing a specific test to determine whether a particular error is harmful and entrusts that determination to the sound discretion of the reviewing

court. *Cent. Expressway*, 302 S.W.3d at 870. In conducting a harm analysis, we review the entire record. *Cent. Expressway*, 302 S.W.3d at 870; N*issan*, 145 S.W.3d at 144; *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000). "[I]t is not necessary for the complaining party to prove that 'but for' the exclusion of evidence, a different judgment would necessarily have resulted." *McCraw v. Maris*, 828 S.W.2d 756, 758 (Tex. 1992). The complaining party must only show "that the exclusion of evidence probably resulted in the rendition of an improper judgment." *Id.* "[E]xclusion or admission of evidence is likely harmless if the evidence was cumulative" or if "the rest of the evidence was so one-sided that the error likely made no difference in the judgment." *Cent. Expressway*, 302 S.W.3d at 870; *see also Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 873 (Tex. 2008).

*Analysis*

Even if we assume that the trial court erred by admitting K. M.-J.'s medical records, which contained information about her healing, but untreated broken ankle from doctors who were never designated as witnesses, we nonetheless conclude that, after considering the record as a whole, the admission of the evidence was harmless.

First, we note that there was other, unobjected-to evidence that referred to K.M.-J.'s broken ankle. In Exhibit 8, the Department's Removal Affidavit, Craig

10

Lightfoot alleged that "[t]he Department is concerned that [Joseph] sustained trauma to his intestines that led to his death, that [K.M.-J.] has an untreated broken ankle, and the possible trauma to [D.A.R.-J.]." Exhibit 11, the Mother's Family Service Plan, likewise refers to the injury by stating, "[K.M.-J.] has a healing ankle fracture and [D.A.R.-J] had abnormalities in his CT scan. Both children are developmentally delayed. The parents took no measures to get their children treatment." Exhibit 12, Jorge's Family Service Plan, contained similar information. And, on November 20, 2012, Craig Lightfoot testified at a pretrial hearing about the reasons the children were removed from H.J.'s home, and included information about K.M.-J.'s "healing fracture," and H.J.'s explanation thereof. Therefore, information about K.M.-J.'s broken ankle was before the trial court in other, unobjected-to evidence, in addition to Exhibit 17, her medical records containing the opinions of the undesignated doctors.

Secondly, while the information about K.J.-J.'s untreated ankle was certainly relevant to the issue of child endangerment, far more persuasive and important was the evidence that Joseph was killed after "play boxing" with Jorge, that H.J. knew about the "play boxing," but neglected initially to tell police, and that, even after admitting to seeing the "play boxing," recanted and claimed that she did not know that Jorge had hit Joseph. Evidence that H.J. knew of injuries to Joseph but failed to protect him or immediately seek treatment was much more relevant to the

11

endangerment issue, and, even without evidence of K.M.-J.'s ankle injury, it is probable that the same judgment would have been reached by the trial court, given that a child's death occurred.

But most importantly, we note that the trial court, by continuing the trial for eight months after the medical records were introduced, effectively granted a continuance that cured the alleged error. The purpose of Rule 194.2 is to give the opposing party sufficient information about an expert's opinion to prepare to cross-examine the expert and to prepare rebuttal evidence. *See Pro Plus, Inc. v. Crosstex Energy Servs., L.P.*, 388 S.W.3d 689, 705 (Tex. App.—Houston [1st Dist.] 2012), *aff'd*, 430 S.W.3d 384 (Tex. 2014). Here, trial began on January 30, 2014, and, after the admission of the medical records and two witnesses—the custodian of the records and H.J.—the trial was adjourned and did not resume until October 7, 2014. Even if Doctors Harris and Seghers had not been properly designated as experts in response to the H.J.'s request for disclosure, defense counsel knew that their records had been admitted in the trial, and had over eight months to prepare to cross-examine them or to obtain rebuttal evidence. Thus, error, if any, caused by the trial court's admission of the medical records after DFPS's failure to timely designate the physicians as expert witnesses was harmless. *See* TEX. R. APP. P. 33.1.

Accordingly, we overrule H.J.'s first issue on appeal.

**SUFFICIENCY OF THE EVIDENCE**

In her second issue on appeal, H.J. argues that the evidence is legally and factually insufficient to support the trial court's findings that she (1) allowed the children to remain in conditions or surroundings which endangered the children's physical or emotional well-being or (2) engaged in conduct or placed the child with someone who engaged in conduct that endangered the physical or emotional well-being of her children. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (1)(E). Further, in her third issue, H.J. contends that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the children's best interest. *See id.* § 161.001(2).

### *Standard of Review*

A parent's natural right to the "companionship, care, custody, and management" of his or her children is of constitutional dimension and is an interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *accord In re E.R.*, 385 S.W.3d 552, 563 (Tex. 2012) (quoting *Santosky*); *see Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). A termination decree is complete, final, irrevocable, and divests for all time that natural right as well as all legal rights, privileges, duties, and powers between parents and their children except for the child's right to inherit. *Holick*, 685 S.W.2d at 20. We strictly scrutinize termination proceedings and strictly construe

13

the involuntary termination statutes in favor of the parent. *See id*. However, "the rights of natural parents are not absolute," and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)). Recognizing that a parent may forfeit his or her parental rights by his or her acts or omissions, the primary focus of a termination suit is protection of the child's best interests. *See id*.

In a case to terminate parental rights under section 161.001, the Department must prove, by clear and convincing evidence, (1) that the parent committed one or more of the enumerated acts or omissions justifying termination and (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001; *see In re J.O.A.*, 283 S.W.3d 336, 344–45 (Tex. 2009). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re J.O.A.*, 283 S.W.3d at 344 (quoting TEX. FAM. CODE ANN. § 101.007 (West 2014)). "Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d at 362. Thus, if the trial court's judgment relies on multiple predicate grounds, we may affirm on any one of those grounds. *In re*

*D.S.*, 333 S.W.3d 379, 388 (Tex. App.—Amarillo 2011, no pet.); *In re S.N.*, 272 S.W.3d 45, 49 (Tex. App.—Waco 2008, no pet.).

In reviewing the legal sufficiency of the evidence in a parental-rights-termination case under section 161.001, we look at all the evidence to determine whether the evidence, viewed in the light most favorable to the finding, is such that the factfinder could reasonably have formed a firm belief or conviction about the truth of the issues on which DFPS bore the burden of proof. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We defer to the trial court as fact-finder and resolve disputed facts in favor of its finding if a reasonable factfinder could do so. *See In re J.F.C.*, 96 S.W.3d at 266; *Jordan v. Dossey*, 325 S.W.3d 700, 713 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

Termination findings withstand a factual sufficiency challenge if the evidence is such that a reasonable factfinder could form a firm belief or conviction that the statutory grounds for termination exist. *In re C.H.*, 89 S.W.3d 17, 18–19 (Tex. 2002). To reverse a case on factual insufficiency grounds, "the reviewing court must detail the evidence relevant to the issue of parental termination and clearly state why the evidence is insufficient to support a termination finding by clear and convincing evidence." *Id.* at 19.

***Evidentiary Sufficiency That H.J. Engaged in Endangering Conduct***

In her second issue, H.J. contends that the evidence is legally and factually insufficient to support termination of her parental rights under Texas Family Code section 161.001(1)(E). This provision provides a basis for terminating parental rights because of child endangerment. "'To endanger' means to expose a child to loss or injury or to jeopardize a child's emotional or physical health." *Jordan*, 325 S.W.3d at 723; *accord In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.) (citing *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam)).

"Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *In re T.N.*, 180 S.W.3d at 383 (citing *In re M.C.*, 917 S.W.2d at 269); *see Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533–34 (Tex. 1987); *see also In re J.O.A.*, 283 S.W.3d at 345 (holding that endangering conduct is not limited to actions directed toward child); *Jordan*, 325 S.W.3d at 723 (holding that danger to child need not be established as independent proposition and may be inferred from parental misconduct even if conduct is not directed at child and child suffers no actual injury); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (explaining that relevant conduct may occur either before or after child's removal from home).

Under subsection 161.001(1)(E), a parent's rights can be terminated when she has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(1)(E). The parent's conduct must cause the endangerment, and the endangerment must be the result of a voluntary, deliberate, and conscious course of conduct by the parent rather than a single act or omission. *Jordan*, 325 S.W.3d at 723; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). The parent's conduct does not, however, have to be directed at a specific child, as "the manner in which a parent treats other children in the family can be considered in deciding whether that parent engaged in a course of conduct that endangered the physical or emotional well-being of a child." *Cervantes–Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

The relevant inquiry is whether evidence exists that the parent's conduct—including acts, omissions, and failures to act—directly endangered the child's physical well-being. *See In re J.T.G.*, 121 S.W.3d at 125; *In re D.M.*, 58 S.W.3d 801, 811–12 (Tex. App.—Fort Worth 2001, no pet.). Parental conduct may be relevant even if it does not involve the child or result in actual harm to the child. *See Boyd*, 727 S.W.2d at 533–34; *In re D.M.*, 58 S.W.3d at 811.

17

As H.J. admits in her brief, the evidence "show[s] that [Jorge] struck [Joseph] in the abdomen with such force that it result[ed] in his death," but contends "there was no evidence she was aware that he was capable of inflicting such a horrific injury[,]" and that "this record contains scant evidence that [H.J.] knew or should have known that [Jorge] was capable of striking [Joseph] with such force that it would cause his death."

H.J. also admits in her brief that she "gave patently inconsistent statements as to whether or not she saw [Jorge] play boxing with [Joseph]." And, at the time of trial, she denied that any play boxing ever occurred, even though Jorge himself had admitted to it in his statement to police. The medical examiner concluded that the perforated intestine was caused by a "substantial strike in the torso." From the evidence presented, the trier of fact could have concluded that the play boxing did, in fact, occur, that H.J. saw it or knew about it, and that it was a much more substantial blow than that described by either H.J. or Jorge. By minimizing, or even denying, the severity of the blow that killed Joseph right up until the time of trial, H.J. shows a willingness to protect Jorge over even the well-being of her own children.

There was also evidence that H.J. was untruthful or deceptive about other injuries the children suffered. When asked about the bruises on Joseph's legs, she claimed *both* that he was born with them and that her friend's older children had

18

hit him with sticks. There was also evidence that K.M.-J. had a broken ankle when she was examined the day after Joseph's death, and H.J. had never sought treatment for it.

From the evidence regarding Joseph's death, including H.J.'s questionable testimony about the same, the factfinder had a sufficient basis to conclude that H.J. "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(1)(E); *see Jordan*, 325 S.W.3d at 724 ("Abusive and violent criminal conduct by a parent can produce an environment that endangers the well-being of a child."). There was evidence from which the trial court could reasonably conclude that she failed to obtain critical medical care for her children's injuries. Even if the abuse was at the hands of Jorge, and not H.J., she has shown no willingness to remove him from the children's lives, but has, instead, changed her testimony to protect him, now claiming that she never saw Jorge hit Joseph, even playfully. At trial, H.J. denied ever injuring her children or seeing Jorge injure them. However, in light of H.J.'s conflicting statements about the incident, the trial court was entitled to disbelieve her claim. *See In re J.P.B.*, 180 S.W.3d at 575 (stating factfinder was entitled to disbelieve father's claim that he did not know about child's injuries). Thus, we conclude that the evidence is legally and factually sufficient to support the trial court's finding under section 161.001(1)(E).

19

Because we conclude that the evidence is both legally and factually sufficient to support the trial court's finding under section 161.001(1)(E), and because a finding as to any one of the acts or omissions enumerated in section 161.001(1) is sufficient to support termination, we need not address H.J.'s issue challenging the trial court's findings under section 161.001(1)(D). *See In re A.V.*, 113 S.W.3d at 362; *In re D.S.*, 333 S.W.3d at 388; *Walker*, 312 S.W.3d at 618; *In re S.N.*, 272 S.W.3d at 49. However, we must still determine whether the evidence was sufficient to support the trial court's finding that termination was in the children's best interest, pursuant to section 161.001(2).

## *Evidentiary Sufficiency of Best–Interest Findings*

In her third issue, H.J. contends that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in her children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(2). "A strong presumption exists that a child's best interest are served by maintaining the parent-child relationship." *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). In *Holley v. Adams*, the Texas Supreme Court provided a nonexclusive list of factors that the trier of fact in a termination case may use in determining the best interest of the child. 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and

20

physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.* These factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to parental termination. *See In re C.H.*, 89 S.W.3d at 27; *Adams v. Tex. Dep't of Family & Protective Servs.*, 236 S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

*The Children's Desires*

Both children are under the age of four and are suspected of being developmentally delayed. As such, DFPS was unable to ascertain the desires of the children. Though the children were both too young to express their desires, there was evidence that they were bonded with H.J. and that she loved them. However, evidence of H.J.'s love for the children is not evidence of the desires of the children themselves. *See In re. X.R.L.*, 461 S.W.3d 633, 640 (Tex. App.—Texarkana 2015, no pet.). Further, evidence that a child loves a parent is only marginally relevant to a best interest finding. *In re D.W.*, 445 S.W.3d 913, 926

(Tex. App.—Dallas 2014, pet. denied); *In re M.H.*, 319 S.W.3d 137, 150 (Tex. App.—Waco 2010, no pet.).  This factor, thus, is neutral at best.

> *Parental Abilities of the Individuals Seeking Custody; Programs Available to Assist Those Seeking Custody; Stability of the Placement*

At the time of trial, H.J. had completed her family service plan and had stable housing and a job.  Caseworker Arshield testified that by the time of trial the mother had done everything required by the family service plan, except she had not come to "as many [therapy] sessions as the therapist would like."  Arshield also testified that H.J. could meet the physical and emotional needs of the children.  Consequently, these factors weigh in favor of not terminating H.J.'s parental rights.

> *Plans for the Children by those Seeking Custody*

Nothing in the record indicates what H.J.'s plan would be for the children's future.  However, the Department has formulated future plans for both children.  The last Department progress chart says that D.A.R.-J. had started a head start school program, and was attending twice monthly physical therapy.  K.M.-J. is attending speech therapy twice a month to help her become more verbal.  K.M.-J. is also being closely monitored for possible psychiatric trauma and disorders related to the abuse in H.J.'s home.  The Department has had a psychiatric evaluation done, and is awaiting the results to know how to proceed.  Consequently, this factor weighs in favor of termination.

*The Children's Present and Future Emotional and Physical Needs*

The need for stability and permanence is an important consideration for a child's present and future physical and emotional needs. *In re J.D.B.*, 435 S.W.3d 452, 468 (Tex. App.—Dallas 2014, no pet.); *In re T.G.R.–M.*, 404 S.W.3d 7, 17 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ("Stability is important in a child's emotional and physical development."). The record supports a finding that the children have repeatedly been placed in unstable home environments. There is evidence that Joseph's father was abusive; H.J. testified that he tried to kill her on one occasion, and at the time of trial, she was afraid that he would return, even though he had been deported. And, there was sufficient evidence for the trial court to conclude that H.J.'s second boyfriend, Jorge, was also abusive. Jorge admitted to "play boxing," with Joseph, but the medical evidence contradicts that by showing that Joseph suffered a substantial blow to the abdomen, thereby rupturing his intestine.

Both children have been characterized as developmentally delayed, and K.M.-J. requires speech therapy, and may require ongoing psychiatric care. While H.J. has maintained a home and a job, her financial resources are limited. At the time the children were removed from H.J.'s home there were three children and two adults living in a one-bedroom apartment. After the children were taken from the home, H.J. missed two visitations because she could not afford a taxi ride.

H.J. also has limited familial resources. Although H.J. gave the names of several family members who might be able to take the children after they were removed from her home, most of the relatives were unreachable. An aunt was eventually reached and the children were placed with her, but she returned the children to DFPS within a week of their placement. Finally, H.J. has no assistance in caring for the children. One father was unreachable, the other was deported for domestic violence against H.J., and the last father is incarcerated after being charged with the murder of one of H.J.'s three children.

Given that H.J. will have to provide and care for these children independently, has very limited financial and familial support, and considering that these children have more emotional and physical needs than an average child, it would be very difficult for H.J. to meet her children's special needs. Consequently, this factor weighs in favor of termination.

*Present and Future Emotional & Physical Danger to the Childrens' Interests and Parental Ability*

As to the third and fourth *Holley* factors, "'[e]vidence of past misconduct or neglect can be used to measure a parent's future conduct.'" *In re Z.M.*, 456 S.W.3d 677, 689 (Tex. App.—Texarkana 2015, no pet.) (quoting *In re I.R.K.–N.*, No. 10–13–00455–CV, 2014 WL 2069281, at *7 (Tex. App.—Waco May 15, 2004, pet. denied) (mem. op.) (citing *Williams v. Williams*, 150 S.W.3d 436, 451

24

(Tex. App.—Austin 2004, pet. denied); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue.")).

A factfinder may, however, infer from a parent's past conduct endangering a child's well-being that similar conduct may recur in the future if the child is returned to the parent. *Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied). DFPS presented evidence of H.J.'s history of lying to cover up abuse to her children. H.J.'s children were removed from her home after her three-year-old child, Joseph, was killed. After an investigation, it was determined the child died from blunt force trauma to his torso. Police later indicted the live-in boyfriend of H.J., Jorge, for the murder of Joseph. DFPS filed for temporary custody of the two remaining children after Jorge and H.J. said Jorge had punched Joseph that night while play boxing, then gave conflicting accounts of what happened before Joseph died, and neither could offer a plausible explanation as to how the trauma occurred. At trial, H.J. recanted and said Jorge never hit Joseph. DFPS also learned that H.J.'s former live-in boyfriend, Martinez-Morales, had physically abused her and had been deported for that reason.

Here, H.J. has a history of living with abusive men. One of H.J.'s children has died as a result of blunt force trauma caused by a man with whom H.J. chose to live. This factor weighs in favor of termination.

*The acts or omissions of the parents and any excuse for such acts or omissions*

H.J. had the opportunity when she testified to clarify what happened to Joseph that caused his death, and she did not do that. Instead, the evidence is that she delayed in obtaining medical care and was evasive as to the cause of his injuries. Nothing in the record indicates that H.J. had a justification for her actions.

*Conclusion*

Viewing all the evidence in the light most favorable to the judgment, we conclude that a factfinder could have formed a firm belief or conviction that termination of H.J.'s parental rights was in K.M.-J.'s and D.A.R.-J.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(2); *J.F.C.*, 96 S.W.3d at 265–66. Viewing the same evidence in a neutral light, the disputed evidence is not so significant as to prevent a factfinder from forming a firm belief or conviction that termination of H.J.'s parental rights was in K.M.-J.'s and D.A.R.-J.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(2); *J.F.C.*, 96 S.W.3d at 265–66. Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of H.J.'s parental rights was in K.M.-J.'s and D.A.R.-J.'s best interest.

Accordingly, we overrule H.J's third issue.

## CONCLUSION

We affirm the trial court's order terminating H.J.'s parental rights.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Bland and Huddle.